UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHESTINE G.,[1] | ) |
| | ) No. 21 CV 943 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| KILOLO KIJAKAZI, Commissioner of Social Security, | ) |
| | ) October 10, 2023 |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Chestine G. has pursued disability benefits for more than 10 years, including by previously petitioning the court twice to overturn decisions by the Social Security Administration ("SSA"). In the first appeal, the court reversed the SSA's denial of disability benefits, *Chestine G. v. Colvin*, 225 F. Supp. 3d 682, 693-94 (N.D. Ill. 2016), and on remand the SSA awarded Chestine benefits for the discrete time period from August 14, 2013, to May 5, 2015, (the "Benefit Period") but denied benefits for the period before and after this timeframe. In the second appeal, the court affirmed the SSA's denial of benefits before and after the Benefit Period. *Chestine G. v. Saul*, No. 18 CV 4980, 2020 WL 1157384, at *1 (N.D. Ill. March 10, 2020). Here, Chestine seeks supplemental security income ("SSI") from March 23, 2018. She asserts that osteoarthritis of her cervical spine, degenerative disc disease of the lumbar spine, and chronic pain with significant psychosocial dysfunction prevent her from working. She

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Chestine's first name and last initial in this opinion to protect her privacy to the extent possible.

brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying her application for benefits. Before the court are cross motions for summary judgment. For the following reasons, Chestine's motion is denied, and the government's is granted:

## Procedural History

Chestine filed an SSI application in January 2019, alleging disability beginning on March 23, 2018. (Administrative Record ("A.R.") 40, 233-37). After her application was denied initially and upon reconsideration at the administrative level, (id. at 40, 93-103, 105-15), she sought and was granted a hearing before an Administrative Law Judge ("ALJ"), (id. at 40, 189-99). Chestine appeared with her attorney at a June 2020 telephonic hearing, at which she and a vocational expert ("VE") testified. (Id. at 40, 56-92.) The ALJ decided in July 2020 that Chestine is not disabled. (Id. at 40-49.) The Appeals Council denied her request for review, (id. at 3-5), making the ALJ's decision the final decision of the Commissioner, *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Chestine then sought judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 15).

## Analysis

Chestine argues that the ALJ erred by failing to: (1) identify all of her severe impairments at step two of the five-step analysis; (2) find that her impairments meet or medically equal a listed impairment at step three; and (3) assess an RFC reflecting her inability to perform past jobs or other jobs in the national economy. (R. 27, Pl.'s Br. at 10-17.) When reviewing the ALJ's decision, the court asks only whether the

2

ALJ applied the correct legal standards and substantial evidence supports the decision, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing the evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). However, the ALJ must "provide a 'logical bridge' between the evidence and his conclusions," *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021), supplying enough detail to "enable a review of whether the ALJ considered the totality of a claimant's limitations," *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021). Having considered the arguments and record, the court concludes that the ALJ supported his decision with substantial evidence.

A. **Severe Impairments**

Chestine contends that the ALJ erred at step two by finding that she suffered from only two severe impairments—osteoarthritis of the cervical spine and degenerative disc disease of the lumbar spine. (R. 27, Pl.'s Br. at 11 (citing A.R. 43).) She asserts that the ALJ should have also found that her left shoulder and elbow pain is a severe impairment. (Id.) Under 20 C.F.R. § 404.1520(c), "severe" means a significant limitation that interferes with a claimant's ability to work. Courts have construed "severe" to mean only more than "slight." *See, e.g., Colson v. Colvin*, 120 F. Supp. 3d 778, 788 (N.D. Ill. 2015) (citing *Anthony v. Sullivan*, 954 F.2d 289, 293

(5th Cir. 1992)). Thus, an impairment is not severe if it is "a slight abnormality having only a minimal effect on a person's ability to perform the full range of work-related activities." *Chapman v. Barnhart*, 189 F. Supp. 2d 795, 804 (N.D. Ill. 2002).

At step two the ALJ acknowledged Chestine's testimony that her left shoulder and elbow caused her pain but deemed this impairment not severe because the record did not show that the pain caused any functional limitations lasting for 12 continuous months. (A.R. 43-44.) For support the ALJ cited imaging and treatment records revealing "minimal degenerative changes," "no evidence of acute abnormality," and only "slightly limited range of motion in the left shoulder" in October 2018. (Id. at 43.) The ALJ also relied on the consultative examiner's ("CE") findings that Chestine had "full range of motion and full strength in the left upper extremity" in April 2019. (Id.) Although Chestine testified that she had received cortisone shots in her left shoulder, the ALJ found no evidence in the medical record from the relevant period to support her testimony. (Id.)

The ALJ further discussed Chestine's shoulder and elbow pain when assessing her RFC. (Id. at 45-47.) The ALJ again noted Chestine's pain complaints and considered imaging, examination, and treatment records, ultimately concluding that Chestine was capable of performing light work but could never climb ladders, ropes, or scaffolds or more than occasionally stoop, crawl, or climb ramps or stairs. (Id. (citing id. at 512, 515, 520, 539, 542, 562-69, 643).) When assigning this RFC, the ALJ cited Chestine's reports to the CE that she experienced pain with prolonged activity, as well as the CE's findings that Chestine had full range of motion and full

4

strength in her shoulders and elbows, 5/5 grip strength, normal "ability to perform fine and gross manipulation," and "clinically stable" shoulder pain. (Id. at 46 (citing id. at 564, 566).) To accommodate Chestine's shoulder impairment, however, the ALJ limited her to light work with postural limitations because, according to him, heavy lifting and greater activity could exacerbate or trigger pain. (Id. at 47.) The ALJ noted that "[n]o treating or examining medical professional ha[d] opined that [Chestine was] more limited." (Id.; but see id. at 12 (October 2020 physical therapy notes indicating Chestine's diagnosis of "[c]hronic pain associated with significant psychosocial dysfunction" and noting "elbow symptoms with increased pain/symptoms, impaired mobility, impaired activity tolerance").)

Chestine argues that the ALJ's rejection of her pain complaints "constitutes reversible error." (R. 27, Pl.'s Br. at 12.) But as the government points out, even if the ALJ erred at step two in determining that Chestine's shoulder and elbow pain is non-severe, such errors "are harmless unless the claimant can show the allegedly overlooked impairments caused limitations not found in the RFC." (R. 31, Govt.'s Mem. at 2 (citing *Curvin v. Colvin*, 778 F.3d 645, 649-50 (7th Cir. 2015)).) Here, the ALJ considered Chestine's complaints of shoulder and elbow pain, as well as the objective medical evidence, when assessing whether this pain warranted additional limitations beyond those he had assessed in her RFC. (A.R. 43-44.) He found it did not, and supported his assessment with substantial evidence, as noted. (Id.) Regardless, Chestine suggests no limitations that should have been included in her RFC but were not, and no physician opined that Chestine required greater limitations

5

than those the ALJ found. (R. 31, Govt.'s Mem. at 2 (citing *Best v. Berryhill*, 730 Fed. Appx. 380, 382 (7th Cir. 2018) ("There is no error when there is 'no doctor's opinion contained in the record [indicating] greater limitations than those found by the ALJ.")).) Accordingly, there can be no remand on this ground.

**B.     Listings**

Chestine next challenges the ALJ's step-three finding that her osteoarthritis of the cervical spine, degenerative disc disease of the lumbar spine, and chronic left shoulder and elbow pain do not meet or medically equal listings 1.04 (disorders of the spine) or 1.02 (major dysfunction of a joint). (R. 27, Pl.'s Br. at 13-15; A.R. 44-45.) At step three the ALJ "compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations" referred to as "the listings." *Victoria R. v. Kijakazi*, No. 20 CV 4444, 2022 WL 3543231, at *2 (N.D. Ill. Aug. 18, 2022). Certain criteria described in the SSA regulations must be satisfied to meet or medically equal a listing, and the claimant alleging a listings-level impairment bears the burden of demonstrating that she satisfies the necessary criteria. *See* 20 C.F.R. §§ 404.1509, 404.1520(d), 404.1526; *see also Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

The court first examines the ALJ's analysis of listing 1.04. As an initial matter, the ALJ acknowledged that Chestine previously had been found disabled during the Benefit Period because she met or equaled listing 1.04A. (A.R. 44-45.) The ALJ noted, however, that this finding was based on "independent medical expert testimony" documenting the frequency of "cervical and lumbar epidural steroid

6

injections," which is not applicable to the period relevant here. (Id. at 45.) After considering record evidence for the period in question, the ALJ determined that Chestine's impairments do not meet or medically equal listing 1.04A because there is no evidence of nerve root compression with motor, sensory, or reflex loss, or positive straight leg raising, as required for a claimant alleging lower back pain. (Id. at 44.) And the ALJ noted Chestine's own testimony that she walks frequently, along with treatment records showing she has normal gait. (Id.)

Chestine argues that, in so finding, the ALJ improperly focused on her ability to walk, rather than her "distribution of pain," for which she "regularly sought treatment" during the applicable period. (R. 27, Pl.'s Br. at 13-14.) In focusing on her pain, however, Chestine ignores the other elements required under listing 1.04A, including nerve root compression not only with "neuro-anatomic distribution of pain" but also with "limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." (Id. (citing listing 1.04).) The ALJ discussed the latter requirements—including motor loss accompanied by sensory or reflex loss and positive straight-leg raising—and found no evidence to support them. (A.R. 44.) Chestine fails to cite any evidence to the contrary. Furthermore, the ALJ found "persuasive" the opinions of the state agency physicians, both of whom determined that Chestine did not meet listing 1.04A. (Id. at 47; see also id. at 97, 110.) There was no error here.

7

The court next examines the ALJ's analysis of listing 1.02. Chestine again asserts that the ALJ set aside her pain complaints and ignored record evidence showing she had difficulty performing fine and gross manipulations when analyzing listing 1.02B. (R. 27, Pl.'s Br. at 14-15.) But the ALJ examined the record and adequately explained why Chestine does not satisfy this listing. In particular, the ALJ relied on the CE's findings that Chestine had "normal" ability to perform fine and gross manipulation. (A.R. 45 (citing id. at 564 (noting grip and muscle strength of 5/5 in upper extremities), 569 (recording "[n]o difficulty" with fine and gross movements of right and left hands and fingers)); see also id. at 97, 110 (noting state agency physicians considered listing 1.02 at initial and reconsideration stages and found Chestine's impairments do not meet or medically equal that listing).) The ALJ also cited imaging showing Chestine's left upper extremity has "minimal abnormalities," and that there are no abnormalities in Chestine's right upper extremity. (Id. at 45.) Accordingly, there was no error here either.

**C.    RFC Assessment**

Chestine contends that the ALJ "selectively quote[d]" excerpts from her medical records regarding her ability to walk and her symptoms related to her upper extremities and ignored relevant evidence when crafting her RFC. (R. 27, Pl.'s Br. at 15-17.) An RFC measures the tasks a person can perform given her limitations based on "all the relevant evidence" in the administrative record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). When assessing the RFC, the ALJ must "evaluate all limitations that arise from medically

8

determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). Where the ALJ does not rely upon medical opinions, he must "thoroughly discuss[] the medical and other evidence," considering each of the claimant's "impairments and related function deficits," *Nina Joyce H. v. Saul*, No. 18 CV 4913, 2020 WL 212771, at *7 (N.D. Ill. Jan. 14, 2020), and "describ[e] how the evidence supports each [RFC] conclusion," *Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011).

The ALJ here found that despite severe impairments of osteoarthritis of the cervical spine and degenerative disc disease of the lumbar spine and non-severe left shoulder and elbow pain, Chestine could perform light work but never climb ladders, ropes, or scaffolds or more than occasionally stoop, crawl, or climb ramps or stairs. (A.R. 43, 45.) Chestine's first complaint with this RFC is that the ALJ allegedly improperly considered certain record evidence. (R. 27, Pl.'s Br. at 16-17.) She claims the ALJ focused on Chestine's "alleged denials of loss of dexterity or gait disturbance," even though "her impairments all relate to her upper extremities." (Id. at 16.) Yet the ALJ found that one of her severe impairments relates to her lumbar spine, so he appropriately addressed evidence regarding that impairment. The ALJ noted that Chestine's May 2018 car accident caused her to suffer neck pain, "radiating to the left shoulder, as well as back pain." (A.R. 46.) The ALJ also discussed Chestine's lumbar spine impairment, including treatment records revealing normal gait, ability "to heel and toe walk with good strength and coordination," negative straight-leg raising, and

9

full range of motion in the lumbar spine. (Id.) Chestine does not explain how the ALJ's discussion of this evidence was improper given his step-two finding.

Chestine next asserts that the ALJ erred by not considering her "Quick DASH"[2] scores from physical therapy, which she says identify her as "severely disabled" and "crippled." (R. 27, Pl.'s Br. at 16 (citing A.R. 390 (noting score of 54.5% and Chestine's reports of moderate difficulty with left upper extremity functionality and "great level of suffering"), 430 (revealing increase in score to 72.7%, perhaps in light of car accident day before visit), 643 (noting decrease of score from 61.4% to 56.8% since her prior OT evaluation month before visit).) The government is correct that an ALJ need not address every piece of evidence in his decision, so long as he considers all relevant evidence. (R. 31, Govt.'s Mem. at 10 (citing *Murphy v. Colvin*, 759 F.3d 811, 817-18 (7th Cir. 2014)).) Although the ALJ did not specifically address Chestine's Quick DASH scores, he did discuss her physical therapy records. For example, at step two the ALJ noted the suggestion in therapy records that Chestine "was further able to improve her left shoulder flexibility." (A.R. 43 (citing id. at 643 (noting "significantly improved [left] shoulder flexibility")).) In assessing Chestine's RFC, the ALJ also noted that Chestine participated in physical therapy in November 2018 but "was discharged as her progress had plateaued." (Id. at 46 (citing id. at 430 ("At this point, we would like to discharge patient from outpatient OT service due to patient has no significant motor limitation at [left upper extremity] currently and her

---

[2] The government represents that a Quick DASH score generally includes 11 questions about an individual's ability to perform upper extremity movements. (R. 31, Govt.'s Mem. at 10.)

progress of [left] neck/shoulder pain seem[s to have] plateau[ed] with therapy.")).) While Chestine started another round of therapy in early 2019, records showed she "was not compliant with her instructed home exercise program, and was discharged in March 2019 due to lack of potential for further improvement." (Id. (citing id. at 647).) The ALJ noted a lack of evidence revealing further physical therapy after that time. (Id.) As such, the court has no concerns that the ALJ cherry-picked evidence to support his finding.

Chestine also complains that the ALJ did not cite other statements in her physical therapy records, including statements that: "multiple joint[] pain[s] . . . affect her quality of life," (id. at 386); her "grip and pinch strength" is weaker compared with peers of the same age and strength decreased when moving toward left shoulder extension, (id. at 369-70); and she had "no change of her chronic [left] lateral neck pain and . . . mildly bilateral hand strength," (id. at 643). (R. 27, Pl.'s Br. at 16.) This complaint amounts to a request for this court to reweigh the evidence, which it cannot do. *See Burmester*, 920 F.3d at 510 (holding that courts must not "reweigh evidence . . . or substitute [its] judgment for that of the Commissioner"). Here, the ALJ supported his RFC assessment with substantial evidence, including by relying on medical opinions from the CE, who assessed neck, left shoulder, left wrist, and lower back pain but found each impairment to be "[c]linically stable" with Chestine being "able to sit, stand, walk, carry, handle objects, hear and speak without limitations," (A.R. 565), as well as from the state agency physicians, who found that Chestine could perform light work with postural limitations, (id. at 99-101, 111-13).

11

Finally, Chestine contends that the ALJ failed to address the impact frequent visits for medical treatment would have on her RFC. (R. 27, Pl.'s Br. at 16-17.) However, she does not cite any medical records from the applicable period to support this contention. (Id.) And the government points out that very little treatment evidence appears in the record after Chestine stopped physical therapy in March 2019. (R. 31, Govt.'s Mem. at 11-12.) Because Chestine has not "point[ed] to anything in the record to suggest that [her medical] appointments would require [her] to miss a full day of work or that [she] could not schedule [her] appointments outside of working hours," remand is not warranted on this ground either. *Best*, 730 Fed. Appx. at 382.

## Conclusion

For the foregoing reasons, Chestine's motion for summary judgment is denied, the government's is granted, and the Commissioner's decision is affirmed.

ENTER:

_____
Young B. Kim
United States Magistrate Judge